255 So.2d 199 (1971)
Constance Jane OGBORN, on behalf of the Minor Kelly Ann Ogborn
v.
James BUSH.
No. 4552.
Court of Appeal of Louisiana, Fourth Circuit.
October 6, 1971.
On Rehearing December 8, 1971.
Writ Refused January 17, 1972.
*200 Henri Loridans, Bossier City, for plaintiff-appellant.
C. Monk Simons, III, New Orleans, for defendant-appellee.
Before REDMANN, STOULIG and BOUTALL, JJ.
REDMANN, Judge.
An infant, through its tutrix, appeals from the rejection of its demand for alimony from its alleged natural father.
The ultimate question is whether defendant may be declared to be the father, obliged to support the child. The key issue is whether C.C. art. 209 subd. 1's proof criterion is met by a maternity home application in which, defendant admits, he personally wrote his own education, occupation, height and weight in blanks headed "INFORMATION ABOUT THE NATURAL FATHER", after the mother had filled in other items in that part of the form to fit his description.
Defendant, 22 years old at the time, admits coitus with the child's mother, then 18 years old, "maybe eight or nine times", over a period of a month and a half or two months during which he saw her two or three times a week. That period would include the time of conception. He dated her "infrequently" at the time she discovered she was pregnant; he would "sometimes" take her home.
"Q. How did she advise you she was pregnant? Did she call you up and tell you? A. Yes.
"Q. Did she call you at your apartment? A. Oh, I guess, yes.
"Q. Well, at the time, you had no reason to doubt it was your child, did you? A. Well, I assumed by that time it could have been somebody else's.
"Q. You assumed, but you had no reason to doubt A. No."
Describing the circumstances of his filling in some "Information about the natural father", defendant testified:
"Well Connie called me up one day and asked me to come to her apartment to fill out this form. I asked her `Why should I fill it out?' you know, why should I. She said `I don't know.' She said `Well, come on over.' I went over there and she put it in front of me. It was this maternity thing. She wanted me to fill it out. I don't see any point to it, you know, you could have put anybody in the thing."
Defendant did not think filling out the application was an admission of paternity. "I thought anybody could have put their weight and height in there. I told her specifically I wasn't going to sign anything or put my name on anything."
The mother denied coitus with anyone else, testifying the child could not be the child of anyone except defendant. There is, however, testimony by two friends of defendant of coitus with plaintiff. Presumably the trial judge believed at least one of these witnesses, and we are not able to say he erred in doing so.
The pertinent law is found in the Civil Code.
"Illegitimate children, who have not been legally acknowledged, may be allowed to prove their paternal descent." C.C. art. 208.
"In the case where the proof of paternal descent is authorized by the preceding *201 article, the proof may be made in either of the following ways:
"1. By all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so;
"2. When the father, either in public or in private, has acknowledged him as his child, or has called him so in conversation, or has caused him to be educated as such;
"3. When the mother of the child was known as living in a state of concubinage with the father, and resided as such in his house at the time when the child was conceived." Art. 209.
"The oath of the mother, supported by proof of the cohabitation of the reputed father with her, out of his house, is not sufficient to establish natural paternal descent, if the mother be known as a woman of dissolute manners, or as having had an unlawful connection with one or more men (other than the man whom she declares to be the father of the child) either before or since the birth of the child." Art. 210.
Art. 211, treating the case of rape, has no relevance here.
It is important to point out in the present case, where there is evidence of coitus by the mother with two others, that art. 210 does not purport to apply to any of the three cases of art. 209. The fact of being "known" for unlawful connection with another merely makes insufficient the mother's oath supported by proof of cohabitation with the reputed father "out of his house." Art. 210 implies that that oath and proof of cohabitation outside (as opposed to "in his house," art. 209, subd. 3) would suffice (see Rousseau v. Bartell, 1954, 224 La. 601, 70 So.2d 394), unless the woman be known as dissolute or as having had other coitus. Except for the maternity home form, art. 210 would control here to either allow or defeat the filiation claim.
But where there is a suitable private writing, or verbal acknowledgment or education of the child as his, or concubinage in the alleged father's home at conception, the proof of paternity "may be made", art. 209, by showing any of those circumstances. In any of those cases, the proof is greater than the mere oath of the mother and proof of outside cohabitation; and art. 210 only declares insufficient that lesser proof.
We therefore consider whether the filling in the blanks of the maternity home form is included within "all kinds of private writings, in which the father may have acknowledged the bastard as his child, or may have called him so;" art. 209, subd. 1.
The Code Napoleon, art. 340, prohibited establishment of paternity except in case of rape. Planiol, Civil Law Treatise (La. Law Inst.Trans.), I, § 1522, observes that article
"* * * brought about a great many discussions throughout the XIX century * * *. It was one of the worst provisions of the Civil Code. The absolute irresponsibility of the natural father put a premium on debauchery and libertinage. It was the principal cause of the growing number of natural children. It is but proper that the natural father should be subjected to the heavy sacrifices that legitimate parents impose upon themselves for the education of their children. Men of letters, philosophers, economists, of all shades of opinion have one after the other assumed the defense of natural children not acknowledged by their father. All this agitation finally carried public opinion with it. * * *"
The result was the November 16, 1912 amendment of art. 340, authorizing establishment of paternity in five cases (Planiol, I, § 1519), including a written avowal of paternity (Ibid., § 1526-3).
Louisiana has allowed such proof at least since the Digest of 1808, p. 50, art. 31, using the language now found in C.C. art. 209, subd. 1. Nevertheless, because the balance *202 of our Civil Code is largely identical, the French view is pertinent and instructive.
Planiol writes, citing authorities, at § 1526-3:
"The father's avowal is a direct proof. When however it is not adduced in the form of an acknowledgment, its effect is left to the court's discretion. Art. 340, § 3 provides that avowal serves solely as a basis for judicial acknowledgment[1] of paternity. It may be contained in a letter or other private writing emanating from the father. Such writing must be produced in evidence * * *. It makes no difference whether the writing is or is not addressed to the mother herself or to somebody else, or whether it is signed or not, provided it is written by the father * * *."
We conclude that defendant's writing on the maternity home form is a private writing by him in which he acknowledges the child as his own or calls him so, within the meaning of C.C. art. 209, subd. 1.
Defendant admits he described himself in placing his own education, employment, height and weight in spaces for "information about the natural father", when the mother had already filled in his age, race, and color of eyes and hair. ("Well, I guess my weight, I guess she would have a tough time guessing that and my height.")
Despite defendant's testimony (supported by the otherwise unsatisfactory testimony[2] of a friend who was present) that at the time of filling in the form he told the mother that "as far as I was concerned" he was not the father and "wasn't going to sign anything", we believe as did the Supreme Court in an analogous situation in Rousseau, supra, that "a man placed in the circumstances of this defendant would hardly be expected" to take action implying himself to be the father unless he believed he was. Since he testified earlier he had no reason at the time of the pregnancy to doubt his paternity, although he "assumed" someone else could have been the father, we are satisfied his describing himself as the father was in his belief accurate and in that sense deliberate. If he intended it merely as an accommodation to the mother, a man who has completed three years of college and who "didn't see any point to it, you could have put anybody," could have accommodated her over the telephone with "anybody's" description and not his own, and had the mother rather than himself fill in the form. It may well be that defendant wished to escape responsibility, and therefore, in his words, "wasn't going to sign anything"; but he did in writing describe himself as the father, and his signature to the writing is not required by C.C. art. 209, subd. 1.
Defendant's testimony of seeing the mother two or three (she said three or four) times a week over a month and a half to two months at conception time, even allowing his somewhat inconsistent estimate of "maybe eight or nine" instances of coitus, would have supported a belief by him that he was the father. We judge from all the testimony that defendant did not know, at the time of filling out the maternity form, of any other person having sexual intercourse with the mother. He "assumed" that one of his fraternity brothers had, prior to his own relationship, but testified that the latter had not at that time told him he had had relations with the mother. The second friend's testimony is that he revealed his alleged single act of intercourse (occurring subsequent to defendant's relationship) to defendant after defendant had mentioned, casually, in a bar, that the *203 mother was "`trying to hit me [defendant] with a paternity suit.'"
This evidence does not suggest to us that defendant is not the father, but only that, had defendant known of this alleged other coitus, defendant might have had some reason to doubt his paternity and, if he had on that account declined to fill in the maternity form, might have defeated the claim under art. 210.
We judge the theory of art. 210's rigid rejection of oath-plus-cohabitation proof, where the mother is "known * * * as having had" any other coitus, even after the birth, is that the possibility is more real that coitus with others might also have occurred at conception time. But where, as here, the cohabitation with the alleged father is of such frequency and character as to satisfy him that he is the father, so much so that he in any kind of writing describes himself as the father, art. 209 subd. 1 provides that the paternity is sufficiently established for civil liability for alimony to attach. The circumstance of coitus with others becomes immaterial. If the alleged father's intimate knowledge of the circumstances is good enough for him, it is good enough for the courts.
In the case of a man knowingly marrying a pregnant woman, the law considers the groom the father, C.C. art. 190, despite the possibility he may have mistakenly believed the child his. It appears to us the same is true in art. 209 cases; the fact that the art. 209 acknowledgment could be mistaken does not (at least in the absence of fraud) alter that article's provision that the "proof of paternal descent * * * may be made" by a showing like that present here.
We factually distinguish Damman v. Viada, 216 La. 1087, 45 So.2d 632 (1950). There defendant's letters "gave advice concerning her pregnancy. However, there is nothing in these letters to indicate that the defendant recognized or acknowledged that he was the father of the child." Our defendant's writing described himself as the father. The proof required by C.C. art. 209, subd. 1, has been supplied.
Defendant admits trust income of over $22,000 a year, and he co-owns and manages a 12-apartment complex from which he doubtless derives additional income. Plaintiff testified her gross income was $150 a week, and that the infant's food costs $80 a month, clothes $40, and babysitter $120. (The latter is a factor in the child's needs where the mother must work; Ferguson v. Cascio, La.App.1963, 158 So.2d 471.) She had not had any medical expenses for the child. She said her rent was $150, but did not attribute any specific part of that to the child. There was no other evidence as to the needs of the child. We make a rough estimate of $40 as a reasonable allowance for the child's necessary rent and conclude its total need is $280.
Because the obligation is equally father's and mother's, C.C. art. 240, where as here the mother is able to contribute half of the child's present needs, we conclude the father should pay only half, or $140 a month (subject to future modification by the trial court as necessary; Rousseau, supra).
The judgment appealed from is reversed and it is now adjudged that defendant, James Bush, is the father of plaintiff infant, Kelly Ann Ogborn; and there is further judgment ordering defendant to pay alimony for the support of the minor to plaintiff tutrix, Constance Jane Ogborn, at the rate of $140.00 a month, the first payment to be made one week after the date of this judgment. Defendant is to pay all costs.
BOUTALL, Judge (dissenting).
I respectfully dissent.
This is a proceeding by an infant, through its tutrix, to prove paternal descent under the provisions of LSA-C.C. art. 208 et seq., in order to claim alimony under the provisions of art. 242. The trial court dismissed plaintiff's suit, and on appeal, the majority *204 opinion of this court would reverse that decision, holding that there is sufficient proof of paternity under the provisions of the Civil Code art. 209, subd. 1.
The proof of paternal descent offered in this case consists of testimony by the mother that there was coitus between her and the defendant a number of times during that period when conception probably occurred. This was admitted to by the defendant. Additionally, there was introduced into evidence a "Maternity Application" in which the defendant wrote down the answers to certain questions under the section requiring "Information About the Natural Father". As opposed to this, the defendant introduced testimony of several other young men that they, in fact, had coitus with the child's mother at various times. Additionally, he denied that he filled in the answers to the questions in the above referred to document with any thought of acknowledging the child or calling the child his own, but simply because he was attempting to help the young lady enter the Protestant Home for Babies, and to support this, he produced another young man who accompanied him as a witness on the occasion filling out the form. No medical evidence was offered by either party.
The majority opinion apparently agreed with the trial judge that the evidence showed that the mother had an unlawful connection with one or more men (other than the man whom she declares to be the father of the child) before the birth of the child, and accordingly held that the provisions of art. 210 preclude judgment of paternity thereunder. Art. 210 states:
"Effect of mother's oath in proof of paternity:
The oath of the mother, supported by proof of the cohabitation of the reputed father with her, out of his house, is not sufficient to establish natural paternal descent, if the mother be known as a woman of dissolute manners, or as having had an unlawful connection with one or more men (other than the man whom she declares to be the father of the child) either before or since the birth of the child."
However, they further concluded that the maternity application is a writing within the meaning of art. 209 subd. 1, that the principles of art. 210 do not apply to art. 209, and that the methods of proof set out in art. 209 are much greater, and, seemingly, conclusive. While I am of the opinion that the rule of art. 210 does not act as a bar to render insufficient proof demonstrated in art. 209, I do not consider that the methods of proof shown in art. 209 are conclusive, but simply that the effect of that proof is left to the discretion of the court to be considered along with the other circumstances and evidence in the case. I cannot say that the trial judge abused his discretion in this case, or that he committed manifest error.
The writing in question is a "Maternity Application" for admittance to the Protestant Home for Babies, and consists of some seven pages, six of which contain a questionnaire on relevant topics and the last page contains the "Admittance Agreement" setting out the procedures in effect if the applicant is admitted and contains a space for the signature of the applicant. The topics covered in the questionnaire consist of questions concerning the identity of the mother, family information of the mother, educational and employment information about the mother, marital information about the mother, information about the natural father, health and medical information in great detail about the mother, but containing a section to be answered in connection with certain named diseases about the mother, her parents, and the natural father, and finally financial information relating to the financial responsibility for the fees of the agency together with an inquiry as to what the mother intends to do with the expected baby. The majority classified this as a writing in which the defendant acknowledges the child as his own or calls him so because, in his own handwriting, he filled in the blank spaces for answers to four *205 questions under the heading "Information About the Natural Father". Except for this, the mother filled in all the other six pages and signed the document.
The evidence shows that the defendant wrote down the answers to the following questions: Education completed (Junior-College), Present occupation (Student), Height (5' 11"), Weight (155). That topic contains other questions about the natural father answered by the mother, to wit: Age, Race, Does he know you are pregnant, Color of eyes, Color of hair. Additionally, there are other questions, which although relevant, were not answered by anyone, that is: Marital Status, With whom does he live, How long have you dated him, How did he react (to knowledge of pregnancy). The defendant explains his answers to these questions by saying that he wanted to simply help Miss Ogborn receive aid in the Protestant Home for Babies and so he answered those questions to which he felt that she did not know the answers. (The answers to Education Completed and Present Occupation were obviously corrected.) He insists that he had no intention of acknowledging the child to be his or of signing any such document, and in support of this, he produced a witness whom he brought along with him to Miss Ogborn's home when she asked him to come over and consider this application.
The majority disbelieve his explanation because, they point out, the application does not contain any space for him to sign as father of the child and conclude that his coming to Miss Ogborn's apartment at her request and filling in those four questions constitute apparently an acknowledgment of his paternity. However, I consider that the fact that he brought a witness along would tend to show his intention not to sign or say anything which may be construed as naming him to be the father, particularly when the testimony of Miss Ogborn and her sister is to the effect that the defendant consistently denied that he was the father ever since the pregnancy was first discovered.
The testimony of defendant's witness corroborates his statements, and, considering the fact that the document contained no space for the father's signature or name but does contain these instructions "The information you give will be strictly confidential. It is important that you answer every question.", one can readily conclude the testimony of defendant is worthy of belief.
To contradict this evidence there is only the testimony of Miss Ogborn who does not deny the defendant's version but simply avoids it. A sample of her testimony follows:
"Q. When you gave him this particular form did you ask him to fill out that information?
A. I don't remember.
Q. Did he have anybody else with him?
A. Somebody named Phil, I don't know who he is.
Q. Now, at the time you called him and told him about the child what did he say, did he admit to the child being his?
A. He said what was I going to do.
Q. Meaning asking you what you were going to do?
A. What was I going to do.
Q. What did you tell him?
A. I didn't know."
* * * * * *
"Q. Now, do you know of your own knowledge that he acknowledged that this child was his to anyone else or any other person?
A. No. The only time would be when he was filling out the form and that was with Phil who I don't even know."
* * * * * *
"Q. What impression did you get when he was filling out this particular form? Did he say to you when he was filling it out that he was admitting to being the father of the child?
*206 A. I really don't remember.
Q. Do you remember if he told you anything of the nature that you could put anybody in there?
A. No, I don't."

* * * * * *
Not once in all her testimony does Miss Ogborn directly say that the defendant admitted that the child was his, although she does on several occasions positively deny having sexual intercourse with others, a fact about which, it is conceded, she is in error.
The trial judge obviously did not consider that the writing of the answers to these four questions constituted a writing either acknowledging or naming defendant father of the child, or else he felt that the evidence was so weak that he could not conclude that the defendant was, in fact, the natural father. Although he gave no written reasons, the conclusion of the trial judge in either respect is supported by evidence in the record, first, relative to the admitted coitus, by the fact of coitus with others prior to the birth of the child, and secondly, relative to the maternity application, by evidence that the defendant steadfastly refused to admit that the child was his, and that he answered the questions, not for the purpose of saying that the child was his, but simply to help the young lady, with whom he had been familiar, enter a maternity home where she might receive proper care. The record shows sufficient proof to substantiate the findings of the trial judge and justify his belief of defendant's testimony. I find no manifest error in his decision and am of the opinion that the decision of the trial judge should be affirmed.

ON REHEARING
REDMANN, Judge.
Our original opinion and decree are reinstated.
BOUTALL, J., adheres to his original dissent.
NOTES
[1] The judicial declaration of paternity was considered a "forced acknowledgment"; Planiol, I, § 1506.
[2] The friend's other testimony was that "Connie asked Jamie to fill a portion of this out and sign this * * * Connie said she just needed someone to put a name down so that she could get into the home. I believe that is the way it was done." On cross he repeated this definitely. But as then pointed out, the form had space neither for the father's signature nor even for his name.